GENERAL COURT, MAY TERM, 1799.

MAHONEY *vs.* ASHTON.

PETITION for *freedom,* the petitioner claiming to be descended from a free woman named *Ann Joice.*

BILLS OF EXCEPTIONS.

1. The petitioner, at the trial of the issue, by his counsel, produced and offered to read in evidence to the jury the deposition of *Ann Hurdle,* taken by consent on the the 28th of May 1797. But the defendant, by his counsel, objected to the following part of the said deposition being read in evidence to the jury, to wit: " That she [*Mary Hurdle,* the mother of the deponent's husband,] " said just so they served *Ann Joice's* family; that by " all accounts they are in confinement now, and they ought " to have been free long ago;" as containing the declaration of opinions as to a right, and not a declaration as to any fact; and therefore improper and inadmisssible to go to the jury.

CHASE, Ch. J. *(a)* The Court are of opinion that the part of the deposition objected to is admissible to be read in evidence to the jury, the same being *general reputation* of the fact that *Ann Joice's* family were free. The defendant excepted to this opinion, &c.

2. The petitioner also offered to read in evidence to the jury, the following part of the deposition of *Ann Hurdle*, taken on the 28th of May 1797, by consent, to wit: " That " she has also heard the *Tuckers* and *Lovejoys*, who " were old people, and who are now dead, talk about it, " but cannot recollect what they said, more than they " censured those who kept them." To which the defendant by his counsel, objected.

CHASE, Ch: J. The court are of opinion that the part of the deposition objected to is not evidence, and cannot be permitted to be read in evidence to the jury. The petitioner excepted to this opinion.

3. The petitioner also offered to read in evidence to the jury, the *special verdict* which had been found by the jury, sworn to try the issue in this cause, at October term 1797, *(b)* and which had been heretofore set aside by the court on account of the same being adjudged defective, the fact that *Ann Joice* was in England not being expressly found. To which the defendant, by his counsel, objected, because the petitioner had the same testimony now to support his issue which was offered to the former jury.

CHASE, Ch. J. The court are of opinion that the *special verdict* may be read in evidence to the jury. The defendant excepted to this opinion.

4. The petitioner, by his counsel, prayed the following direction of the court to the jury: "That if, from the evidence, the jury are of opinion that the woman *Joice*, from whom the petitioner is descended, was in England, and came from thence, they must find a verdict for the petitioner."

*Ridgely*, for the petitioner. If *Joice* was a slave before (which we do not admit) the moment she set her foot upon the soil of England, she became free, no matter where she was born or whence she came. If she was once free, we contend she could not afterwards become

*(a)* Done, J. concurring   *Duvall*, J. having been counsel for the petitioner did not sit.

*(b)* Vide ante pages 63 and 210.

May 1799.

Mahoney
vs.
Ashton.

a slave by any change of her residence, nor could any agreement between Lord *Baltimore*, and her former master, affect her, or impair this right in the slightest degree.

Slavery is incompatible with every principle of religion and morality. It is unnatural, and contrary to the maxims of political law, more especially in this country, where "we hold these truths to be self evident, that all men are created equal;" and that liberty is an "unalienable right." These doctrines are supported by the writers on natural law. 1 *Ruthetf. Inst. ch.* 20, s. 3—"Though it may be possible for a man to be a slave from his birth, yet no man is naturally a slave. They who are slaves from their birth must have been made such by some accident which happened before they were born; slavery is by no means their natural condition." And it is also said, (1 *Ruth. Inst. ch.* 10, s. 4.) "No man can absolutely and without reserve renounce his liberty." By the common law of England no person can have a property in another as a slave; and slavery can only be established by municipal regulations.

In deciding this question, the court are not to be guided or governed by any principles of law which have been recognized as to villeins in England. There is no analogy between villenage and slavery in this country, and so the court of appeals decided in the case of *Butler* vs. *Boarman.* (a) Indeed the dissimilarity is so evident as to preclude argument. Villeins were either *regardant*, that is, annexed to the manor or land, or else they were *in gross*, that is, annexed to the person of the lord, and transferable by deed from one owner to another. If a niefe took a freeman to her husband, their issue was free. A man might become a villein by confession in a court of record. If a niefe had a bastard, he was free. In case of marriage the issue followed the condition of the father, the children of a free woman becoming villeins, and of a niefe becoming free, where a freeman married a niefe, or a free woman married a villein—*Co. Litt. s.* 185, 186, 187. These and many other rules of law adopted as to villeins, plainly mark the line of difference between slavery in this country, and villenage in England, and prove the correctness of the decision in the case of *Butler* vs. *Boarman.* In the reign of *Edward VI.* vagabonds in England were by statute made slaves for two years upon conviction before two justices—4 *Reeves Eng. Law* 451, 452, 453; but this statute was soon repealed, (1 *Blk. Com.* 424,) and the punishment of slavery abolished, although vagrancy had become an excessive grievance.

(a) 1 Harr. & M'Hen. 371. 2 Harr. & M'Hen. 214.
VOL. IV. 38

MAY 1799.
Mahoney
vs.
Ashton.

and the statutes against it were highly penal. This is an evidence of the abhorrence with which slavery was regarded at that day, (1547,) in England. The Portuguese in 1455 commenced the slave trade. They were followed by the Spaniards and Dutch. The African company was established in England in 1672, (Charles II) and in 1689 they entered into an agreement to supply the Spaniards with slaves. In 9 *and* 10 *William III.* (1698,) an act passed relative to the slave trade; and also in 1726, (13 *Geo. I ch.* 8,) and in 1749, (23 *Geo. II. ch.* 31.) None of these acts countenance a slave trade to England. If we revert to the condition of these persons in Africa, we find that they were captives who had been taken in their wars, and were sold to the traders as slaves. The first act of the legislature of Maryland which notices slaves, was passed in 1663, *ch.* 30. The practice and usage of trade before that act never extended to persons who went to or came from England. The trade from Africa to America was direct; and as the slave trade was contrary to the policy of the common law and of England, no person was held as a slave, unless he came through that course or medium of trade established by act of parliament. "This spirit of liberty," (1 *Blk. Com.* 127, 424, 425) "is so deeply implanted in our constitution, and rooted even in our soil, that a slave or a negro, the moment he lands in England, falls under the protection of the laws, and so far becomes a freeman; though the master's right to his services may possibly still continue." "The law of England abhors and will not endure the existence of slavery within this nation." The law of England did not dissolve a civil obligation between the master and servant as to his perpetual service; but this could not extend to the issue of the servant, and reduce them to slavery. In the case of *Smith vs. Brown & Cooper,* ( *Salk.* 666,) decided in 13 *Will. III.* Lord *Holt,* Ch. J. said, " as soon as a negro comes into England he is free; one may be a villein in England, but not a slave;" and in this case it was determined, that *indebitatus assumpsit* would not lie for the price of a negro sold in England, and that the plaintiff ought to have averred that the sale was in Virginia, and by the laws of that country negroes are saleable.—S. C. *Holt,* 495. In the succeeding reign, (4 *Ann.* ) it was determined that *trover* would not lie for a negro, *Smith vs. Gould,* ( *Salk.* 666, 667, S. C. 2 *Ld. Raym.* 1274. ) In this case, (in Lord *Raymond,* ) *per totam curiam.* "This action does not lie for a negro, no more than for any other man; for the common law takes no notice of negroes being different from other men. By the common law no man can have property in another." "There is no such thing as

a slave by the law of England;" and the court denied the opinion in the case of *Butts vs. Penny*, (2 *Lev.* 2<sup></sup>1. S. C. 3 *Keb.* 785,) and per *Holt*, Ch. J. (1 Lord *Ray.* 146.) Trover will not lie for a negro. In the year 1753, the legislature of Virginia, persuaded of the correctness of the doctrine we contend for, passed a law to prevent slaves getting free by going to England. Our act of assembly, (1663, *ch.* 30,) does not relate to negroes who came from England; this must be inferred from the words of the act, which says, "that all *negroes*, and *other slaves*, IMPORTED," &c. The term *imported* does not allude to any who may come from Great Britain; it must be applied to those brought here from Africa, with which country the slave trade was then sanctioned. The act does not say *all negroes* brought into Maryland shall be slaves.—The words of the law are, "that all negroes, or other slaves, already within the province, and all negroes and other slaves to be hereafter imported into the province, shall serve *durante vita;* and all children born of any negro or other slave, shall be slaves as their father's were, for the term of their lives." *(a)*—*Lib. C. & W. H. fol.* 153. This act is highly penal, and therefore by the general rule ought to be construed strictly, and not extended beyond the letter of the law.

With all these cases and principles in our favour, we contend that the act of *Joice's* landing in England, operated as an emancipation of her from the bonds of slavery, even if she were a slave before. If this be the law of England, our courts will notice that law; for the rule is undoubted, that courts of justice will notice the laws of other countries, and enforce them, where a principle like the present is agitated, if they are not repugnant to justice or to our own civil institutions. Then *Joice's* issue, born in England, could not be slaves, or held as such. We will for illustration suppose, that a writ of *Habeas Corpus* had been issued for *Joice*, and she had been discharged, she never could have been claimed afterwards as a slave. Again, suppose a petition had been filed by her in Maryland, and judgment given against her, and upon an appeal to the king in council that judgment had been reversed, would not she and her issue be free? This case must now be considered as it would have been at that time. Even now, if we advert to the laws of a sister state, Pennsylvania, if a person from this state carries a slave into that state, and keeps him there six months, the slave becomes free and emancipated, and could not be held in slavery if he returned again to this state. So it was with *Joice*, and her issue, after she went to England.

*(a)* See 1 *Harr. & M‘Hen.* 371.

MAY 1799.

Mahoney
vs.
Ashton.

He concluded his argument by observing, that he was confident the court would decide fairly and without bias between these parties, thus evincing to the world, that what Mr. Solicitor General *Norton,* in the case of *Wilkes vs. Wood, (Lofft's Rep.* 9) had said as to freedom in England, was equally applicable here, "that there is *no man so high* that he is *out of the reach of the law,* nor any *man so low,* that he is *beneath the protection of it."*

*Jenings,* on the same side. This question is to be decided upon the principles and maxims of the law of England. As a preliminary we must see what the writers upon English law have defined slavery to be. *Grotius L.* 2, *ch.* 5, *s* 27, calls it an obligation *to give* all our labour for a supply of the bare necessaries of life. *Rutherforth,* in his *institutes, B.* 1. *ch.* 20, thus defines it: "Perfect despotism seems therefore to be an alienable right to direct all the actions of another; and consequently perfect slavery is an obligation to submit to be thus directed." Neither of these definitions are satisfactory. The master may have a right to his servant's perpetual service; he may have a right to administer correction; but he has no right over life or limb. Slavery cannot be justified on any principles whatever, and it is reprobated by every writer upon the subject. The great foundation upon which it rests is captivity—*Puff. B.* 6, *ch.* 5, *s.* 10, *ch.* 3, *s.* 6. *Grotius B.* 3, *ch.* 7, *s.* 7. *Bynk. Lib.* 1, *tit.* 3, *Mont. B.* 15, *ch.* 3. 2 *Ruth.* 573. 1 *Ruth.* 478. Amongst many other causes or reasons given for slavery, the most reasonable one is assigned by *Rutherforth* in his *institutes, Vol.* 1. *B.* 1, *ch.* 20, *s.* 4.—"Thirdly, slavery may arise from damages done where the person who did it has no other way of making reparation." And again, Vol. 1. *B.* 1. *ch.* 9. *s.* 17. "The law of nature will allow those who are prisoners to be made slaves by the nation who takes them, to repair the damages that gave occasion to a just war, or that are done in it, and to make satisfaction for the expenses in carrying it on, so that their labour, or the price for which they are sold, may discharge these demands." To the same effect is *Grotius, L.* 3. *ch.* 7, *s.* 5—This is the reason assigned by every nation, Greeks, Romans, Jews, Germans, &c. *Tacitus, ch.* 24, 25. *Cesar's Com.* 13. But none of these reasons exist as to the natives of Africa. And in vain shall we recur to these principles for arguments to justify slavery, so utterly subversive and contrary as it is, and as all the decisions go to prove it to be, to the very spirit and genius of the laws of England. To prove the abhorrence with which the slave trade was viewed, he called the attention of the court to an extract

from a very celebrated work, which would evince how soon was its decline in Europe—1 *Robertson's History of America*, B. 3, *pa.* 320, *ch.* 5—"One of the first advantages which the Portuguese had derived from their discoveries in Africa, arose from the trade in slaves. Various circumstances concurred in reviving this odious commerce, which had been long abolished in Europe, and which is no less repugnant to the feelings of humanity than to the principles of religion." And in England the most effectual remedies have from time to time been adopted for the suppression of slavery. No where can we find in the history of its jurisprudence, or in the writings of the various authors who have commented upon its constitution and laws, a single passage which justifies slavery, as it is thus defined, or speaks of it as existing there. In 1580, slavery commenced by the importation of them to America. No species of bondage ever existed in England excepting *villenage*. *Villeins* were either by blood or tenure; their services were uncertain and indeterminate; they were liable to punishment, but no lord could kill or maim them. A freeman might be a villein, for the rule was *"villenagium sive servitium nihil detrahit libertate."* And again *"tenementum non mutat statum liberi non magis quam servi; poterit enim liber homo tenere puram villenagium, faciendo quicquid ad villanum pertinebit, et nihilominus liber erit"*—*Co. Litt.* 116. *Term de Ley, tit. Villenage.* Villenage descended to the issue where the father and mother were villeins—*Co. Litt. sect.* 181. But if a freeman married a niefe their issue was free—*Co. Litt.* 123. *a. Wilkins*, 7, 8. Tenure in villenage is of an ancient date. Before the conquest there were *villeins* in England—1 *Hume's Hist. Eng.* 181—This was 500 years before the nation engaged in the slave trade. The courts have always discouraged this tenure, widely differing in many essential respects from slavery; and in every case they have invariably acted upon the principle of always presuming in favour of liberty—*Co. Litt. sect.* 202, *to* 209. *Fitzh. N. B.* 78. 2 *Roll. Ab.* 735, 736, 737. In the reign of *Elizabeth*, villenage was at an end; it was abolished. The last case to be found upon the subject of villenage is in *Dyer*, 266, *pl.* 11. 283, *pl.* 32. *Cro. Ent.* 406. *a. Yelv.* 2. *Noy. Rep.* 202. *Hugh. Ab. tit. Villenage.* Villenage ceased to exist as early as the reign of *Edward VI.* (2 *Blk. Com.* 90.) excepting in a few cases where they were held by the clergy. Whether this gradual decay was owing to deaths or manumission, actual or implied, it matters not. The tenure was virtually abolished by the statute 12 *Car. II. ch.* 24. *Charles*, Lord *Baltimore*, who claimed *Joice* as a slave, left England in 1681. He

MAY 1799.

Mahoney
vs.
Ashton.

had been in the province presiding in person in the assembly in 1676, and was again presiding in person in the assembly in September 1681, and continued so presiding at each session until and during December 1688.—*Bacon's Laws of Maryland.* In 1689 there were negroes in America—2 *Lev.* 201. Villenage had ceased in England before Lord *Baltimore* left there. If he brought *Joice* from thence with him, she was a free woman, and his thus taking her among slaves could not alter her condition. Or, on the other hand, if he, or any other person, finding her a slave in this country, carried her to England, she then became free; for not even villenage at that day existed there, having ceased before 1661. That villenage did not exist after 1574, is to be presumed from what is said by *Barrington* in his observations on the statutes, page 288. If therefore villenage did not exist when *Joice* was in England, surely slavery could not. No matter what may have been the condition of *Joice* previous to her being in England, the moment she arrived there she was free; at least she was so far so that her issue born afterwards were in no degree bound to the service of her master.—1 Lord *Ray.* 146, 147. 5 *Mod.* 186. *Judelinus,* 6. *Venius,* 32. *Denewey,* 5. It may, as to this case be granted, that the master had still a right to the service of the former slave *durante vita.* A case is mentioned in 1 Lord *Ray.* 146, 147, between *Gelly* and *Cleve,* in which it was said the court determined that trover would lie for a negro boy. This decision is stated to have been in the common pleas before Lord *Raymond* commenced his reports. If that court ever did make such a decision, it must have been without argument. The case is only cited from memory, and it has been since repeatedly overruled. After weighing these several authorities, even if it be granted that Lord *Baltimore* had at any time previously been entitled to *Joice* as a slave, yet this right was divested on her going to England; and being once thus divested, it never could again attach so as to affect her issue. Much may be said as to the injustice of this case, and the hardship of it; there is no injustice in making the decision, contended for on the part of the petitioner; it was a voluntary act in *Joice's* owner who carried her to England. Let us suppose the case of a ship from Africa, loaded with these human victims to an infamous traffic, being stranded on the coast of England, there would be no injustice in freeing them from a bondage which fraud, violence and rapine, had forced upon them; although their being thus cast upon a friendly shore would be an act of God, which their owners could not avert. And the counsel on the other side cannot contend that the cargo of slaves would not be free. If there is any injustice, any hardship in this case,

the petitioner, and his ancestors, have suffered it; they have been held in thraldom when they were entitled to their freedom; they have been the victims; they have been the only sufferers.

*Martin,* (Attorney-General,) for the defendant, [See his argument in the court of appeals, *Post.*]

*Johnson,* for the petitioner, was about to reply, but was stopped by the court.

CHASE, Ch. J. delivered the following opinion of the court.

Every villein is by prescription or confession in a court of record—*Co. Litt.* 117. *b.* The last confession of villeinage extant is in the 19 *Hen. VI.* (1441.)—*Lofft.* 17, Lord *Mansfield's* opinion. In the time of *Edward VI,* (who was crowned in 1547,) there was not a villein in gross in England—2 *Blk.* 96. *Charles* was crowned in 1625—the charter of Maryland was in the 8th *Chas.* (1633.) The laws relating to villeins do not respect this case, nor can they have any influence in deciding it. *Joice,* the ancestor of the petitioner, was emancipated as soon as she was brought into England, and her condition was changed from that of slavery into servitude for life; and when she was brought into Maryland by Lord *Baltimore,* she was only a *servant,* and the laws concerning slaves did not attach on her, and slavery was not resumed by her coming here, and consequently her issue are free. The numerous acts of parliament respecting the African trade being founded on policy, and having in view the transportation of negroes from Africa to the West Indies and the plantations, never contemplated the bringing slaves to England; and however inconsistent the parliament might be in sanctioning and promoting that inhuman and iniquitous commerce, and not protecting and securing the rights and property acquired under them in their fullest extent; they did not, they could not operate to change the common law of England, and to tolerate slavery in that country. In 2 *Salkeld,* 666, the decision by Lord *Holt,* chief justice, is full in point—it is not a mere dictum, but a determination of the question before the court. *Holt* held, that as soon as a negro comes into England, he becomes free. One may be a villein in England but not a slave. He directed the counsel to amend the declaration, and to declare that the negro was in *Virginia* at the time of the sale; and that by the laws of Virginia negroes were saleable as chattels. If they had been considered as property and saleable by the laws of England, the sale would

MAY 1799.

Mahoney
vs.
Ashton.

have been valid if made there. In 2 *Salk.* 667, *(Smith vs. Gould,)* per curiam—men may be the owners, but cannot be the subject of property by the law of England. 1 *Blk. Com.* 424—The laws of England will not endure slavery within the nation. He then refers to the decision by *Holt* in *Salkeld*—a slave, or negro, the instant he lands in England becomes a freeman, and the law will protect him in the enjoyment of his person and property, and the master retains a right to his perpetual service. In 1 *Ld. Raym.* 146, it is adjudged that trespass will not lie for a negro; and it is said by *Holt* that trover will not lie for a negro. In 2 Ld. *Ray.* 1274—It was decided that an action of trover would not lie for a negro. By the common law no man can have a property in another. Although the judgment was by default, the question came before the court on the writ of inquiry, whether the damages should be assessed for the negro; and the court decided as above. The case of *Butts & Penny,* in 2 *Lev.* 201, denied to be law. *Lofft,* 17, 19—Lord *Mansfield* decided, that a slave was free by coming to England; the slave could not have been discharged on any other ground. If *Somerset* was the slave or property of *Stewart,* *Stewart* had a right to send him to Jamaica for sale, or to any other place. His dominion or power over him as a chattel would have been complete; but the court discharged him because he was free. The court in this case had all the law before them, and after full consideration of it, and after paying due attention to the opinions of Sir *Philip Yorke,* and chief justice *Talbot,* they discharged *Somerset* on the ground that he was emancipated by being in England.

The court, in forming their opinion on the question before them, to make use of the language of Lord *Mansfield,* have not regarded the inconvenience, hardship or loss, of the master on the one side, nor suffered their judgment to be influenced by compassion on the other. The law of England upon which this question must depend, is the rule which has guided their decision, and if they should err they will derive consolation from the reflection that there is a superior court to correct their mistake. This question, in the apprehension of the court, depends on the common law of England. The common law of England is founded on *principles of natural justice,* and rests on immemorial usage and custom as its foundation. The common law must prevail in England until changed by act of parliament. The decisions of the courts of justice, contained in our books of reports and the treatises of learned sages of the profession, are the monuments and evidences of what the common law is. Slavery is not tolerated by the common law, and according to that law a slave becomes free as

soon as he lands on English ground. His condition is changed from that of slavery to servitude for life. The relationship of master and servant subsists in some degree, and in all respects, not incompatible with the common law of England. The master has an interest in him, and a right to his services for life. The master retains the power of moderate correction, and a power of confining him for the purpose of compelling him to render that service the master has a right to. The rights and power of the master may be assimilated to those which exist in the case of apprentices and of servants for years or life. An action will lie for the taking of a negro with a *per quod servitium amisit.* A right to the perpetual service of the negro is not incompatible with the right of the negro to the protection of the laws and the enjoyment of property. A servant for years or for life is entitled to the protection of the laws, and is capable of taking and holding property. He might acquire property by gift or devise, and the master would have no power over it. A slave is incapable of taking or holding property. The acquirements of the slave belong to the master, and the issue are slaves. The courts have decided that every negro held in slavery or as a slave, was presumed to be a slave, and that the *onus probandi* lay on the negro petitioning or claiming freedom. This opinion is founded on the acts of 1663, *ch.* 30, and 1715, *ch.* 44, declaring that all negroes and other slaves imported, or to be imported, should be slaves *durante vita.* The courts have not decided that these words operate to make *all negroes* slaves who were free at the time of passing the above acts; a presumption was created thereby, that all negroes held as slaves were such, and the *onus probandi* was cast on the negro who petitioned for his freedom, which, like all other presumptions, was liable to be combated and repelled by proof.

The court gave the direction to the jury as prayed by the petitioner. The defendant excepted to this opinion.

5. The defendant, by his counsel, prayed the direction of the court to the jury, "that if from the evidence in this cause they are of opinion that a woman called *Joice,* the ancestor of the petitioner, was a negro woman carried with her owner, claiming her as a slave, from the island of Barbadoes to England, and afterwards brought into this country by Lord *Baltimore,* claiming her as a slave, between the years 1678 and 1681, and that she, during her life was held, used and treated, as a slave, and that her issue have been held as slaves ever since, that then they must find a verdict for the defendant."

May 1799.

Mahoney
vs.
Ashton.

CHASE, Ch. J. The court are of opinion, that they ought not to give the direction as prayed by the defendant's counsel; and do therefore refuse to give the said direction to the jury. The defendant excepted to this opinion. The *verdict* and *judgment* being for the petitioner, the defendant appealed to the court of appeals. The case was argued in that court at June term 1802.

*Shaaff*, for the appellant. As to the *first bill of exceptions*—The question here is, as to the admissibility of a certain part of the deposition of *Ann Hurdle*, wherein she states, " that she (the mother of the deponent's husband) said just so they served *Ann Joice's* family; that by all accounts they are in confinement now, and they ought to have been free long ago." This evidence was admitted by the general court, upon the ground of its being *hearsay*, and that it is evidence of subjects of general reputation. It is very questionable whether *the fact* of being *free* is a subject of general reputation, which may be proved by hearsay. Yet granting it to be the case, here the evidence adduced, and allowed by the court to be read to the jury, did not go to *the fact*, but *to the right to be free*. Certain *facts* may be proved by hearsay, but *rights* cannot; as in this case, hearsay may be evidence of the party's having *acted as a free person*; but it cannot be admitted to prove *a right of freedom*. What does this part of the deposition amount to? It is only an expression of *Mary Hurdle's* opinion of the right of the *Joice's* to their freedom. No facts are stated upon which this opinion was founded. If those facts were disclosed, it might be found that this opinion of *Mary Hurdle* was erroneous. Many instances might be put of mistaken opinions; to instance some, she might have heard that they were set free by will; that they were the descendants of a free white woman; and numberless other causes which report might have assigned, and which, if they had been given as the grounds of her opinion, might have proved either to have been unfounded in fact, or if true, not sufficient in law to warrant the conclusion her illiterate mind drew from them. There is no instance, not a case can be produced, in which hearsay has been admitted as evidence of a right. If this doctrine is to prevail, in future times an opinion may prevail, that all negroes have a right to freedom; this may in the course of years come to be a general report; and according to the doctrine of the general court, will then be admissible as evidence to go to the jury.

*Second bill of exceptions.* This exception was taken by the petitioner, and as he has not appealed from the judgment of the general court, the court of appeals will not, it is presumed, give any opinion as to the correctness of the decision contained in it.

*Third bill of exceptions.* This exception is to the opinion of the general court, admitting the *special verdict,* taken in a former trial between the same parties, and set aside by that court as being defective, to be read in evidence at the last trial in this case. The special verdict was set aside for insufficiency; no judgment was rendered thereon; yet notwithstanding, it was admitted to be read in evidence at a future trial, although the petitioner had the same evidence in his power to produce, which he had when the special verdict was found.

To support the opinion of the general court, the counsel for the appellee will, it is presumed, cite *Gilb. L. E.* 87. 3 *Com. Dig.* 279. 1 *Roll. Rep.* 46. But we contend that these cases do not justify the decision which has been given. When a verdict is set aside, it seems clearly that it is void, and is of no more force or effect than if it had never been given. That a verdict cannot be given in evidence without the judgment upon it, cites *Bull. N. P.* 234. 1 *Morg. Ess.* 94, 99, 100. *Lofft's Gilb.* 38. 1 *Stra.* 162. 3 *Com. Dig.* 279, *Hardres* 118.

*Fourth bill of exceptions.* That if *Ann Joice,* the ancestor of the petitioner, was in England, and came from thence, the petitioner is free.

Upon this exception three questions arise, viz.

1st. Whether a negro slave carried to England is there free?

2d. Whether if he there becomes free he is not again a slave when brought to Maryland?

3d. Whether the exception is not so worded as to exclude these questions, and must not be reversed on another ground?

1st. It is not necessary to prove the property of slavery; that it does in fact legally exist is sufficient. The property in the slave is very different from that which a master has in a servant. A slave has no rights—Even the murder or maiming one is only an offence against government. The master has not only a right to his services, but to his person. *Ann Joice* went a slave to England, and as the law protects property, she was not a subject for the law to operate on. The *Magna Charter* relates to freemen. Every man shall enjoy those rights which the law does not take from him; and of course the master had a right to the property in his slave, and neither the common nor statute law took it from him. That *trover* will lie for a negro, &c. he cited 2 *Lev.* 201, (2 Car. II. in 1677.) 3 *Keb.* 785, (2 Car. II. in 1677.) 3 *Lev.* 336, (4 Ann, 1702,) see 1 *Blk. Com.* 129, 451. 2 *Blk. Com.* 406. *Gelly vs. Cleve,* 1 Lord *Ray.* 147. That *trover* will *not lie* for a negro, will be cited 2 Lord *Ray.* 1274, (5 Ann, 1706,) *Salk.* 666. 1 Lord *Ray.* 147. 1

MAY 1799.

Mahoney
vs.
Ashton.

*Lofft,* 17. The *Somersct* case, 1 *Lofft,* 17, is not conclu= sive. It only determines that slaves cannot be held in England.

2d. On this part there can be no authorities. The law of England will not destroy a man's right of pro= perty; and although the slave could not be held in Eng= land, yet when brought here he may—1 *Blk. Com.* 129, 451, 452. There is no reason why a negro brought from England, or any other place, should not be a slave. What is the nature of the slave trade? It is not founded on positive law, but it is founded in custom. In the years 1585 and 1582, charters were granted by Queen *Eliza= beth* encouraging the slave trade. This was long before the charter of Maryland was granted. The trade was not confined to any place; it extended to many African islands, Madagascar, &c. It was of no consequence where a negro was brought from; when here he was a subject of property  Hence I conclude, that if a negro was brought from England he might be sold here as a slave. The first acts of assembly of Maryland upon the subject, are 1663, *ch* 30, and 1681, *ch.* 4. By these acts, and by the act of 1715, *ch.* 44, all negroes, and other slaves, imported, or to be imported, are declared slaves during life. If *Ann Joice* was in this country at the time of passing these laws, and if they have the power, they have enacted that she is a slave. The operation of these laws are important for another purpose; they have de= clared all negroes to be brought into this state shall be slaves. If *Ann Joice* was brought after the operation of these laws, she comes clearly within them, and is made a slave. These laws make no distinction as to the place from whence a negro comes. They cannot be said to be retrospective. It is the same case with every negro brought into the state from Africa; they are made slaves by the law of this state, either by positive law, or by custom recognized as law.

3d. The form of the exception will exclude these questions. The court have directed the jury, that if *Ann Joice* had been in England, and came from thence to Maryland, the petitioner was free. This is not law in the generality; because it is clear, that *Joice* might have been in England, and yet her issue not entitled to free= dom. For example—Suppose she had run off and went to England; or if the Guinea ship, in which she was, had been wrecked and obliged to put into some English port; or suppose her issue had bound themselves as ser= vants, &c.

*Fifth bill of exceptions.* This exception will depend upon the *fourth exception.* It is the converse of that ex= ception; and if a negro, having been in England, does

not make him free, the court ought to have given the direction which the defendant prayed for.

*Harper,* on the same side.   [The first part of the notes of his argument have been mislaid.]   In *Somerset's* case, 1 *Lofft,* 17, Lord *Mansfield* does not say the negro becomes free, but that the right of the master cannot be enforced in England.   The question of freedom was not before the court.   It was, whether the right of service could be enforced.   Lord *Mansfield* recognizes the opinions of *Hardwicke* and *York.*   2 *Ld. Ray.* 1274, recognizes the right, but diff rs as to the mode of enforcing it.   Lord *Holt* meant that the right to the negro was only suspended, not divested.

*Fourth question* (on the *fifth bill of exception,*) as to the generality of the opinion of the general court.

No right can originate in a wrong.   He refers to the case of *salvage,* decided in the supreme court of the United States, *( 1 Cranch. 1. )* where to support a demand for salvage, the capture must be lawful, and a meritorious service must be rendered.   Apply the above maxim —if the slave had runaway and gone to England, or had done an unlawful act, yet, by the opinion given by the general court, she was set free.   Suppose she had consented to have been stolen, and carried to England, she, by that opinion, would have been free.

*Cooke, Key,* and *Mason,* on the same side.   [The notes of their argument have also been mislaid.]

*Johnson,* for the appellee.   *First question* (on the *first bill of exceptions.*)   The court are not bound to determine on the bill of exceptions alone, they may decide on the whole of the case, and if it appears to them that the petitioner is entitled to his freedom, they may affirm the judgment.   Whether or not the petitioner is entitled to his freedom, is a fact; and in all cases of petitions for freedom hearsay evidence has been admitted in evidence to prove the petitioner entitled to freedom; for instance, in the cases of the *Savoys,* the *Shorters,* the *Thomas's,* the *Queens,* the *Bostons,* and the *Toogoods,* (all tried and determined in the general court, and most of them decided on in this court;) the reputation of the neighbourhood, as to the fact of freedom, was admitted in evidence.

*Second question,* (on the *third bill of exceptions.*)   The special verdict was properly admitted in evidence to the jury. In *Gilb. L. E.* 32, it is stated, that if a verdict be had on the same point, and between the same parties, it may be given in evidence.   The reason given why a verdict may be given in evidence is, because the parties have a right

to cross examine; which reason applies, as well to a verdict where no judgment has been entered thereon, as it does to one where a judgment is given.—*Morg. Ess.* 92. So a verdict in another action for the same cause shall be allowed in evidence between the same parties, though the judgment was afterwards arrested for want of form. *Morg. Ess.* 93. 3 *Com. Dig.* 281. 2 *Roll. Ab.* 46. The case in *Bull. N. P.* 234, is a *nisi prius* decision, and not high authority; it is the same case referred to in *Lofft's Gilb.* 38. So if the jury are agreed, and afterwards discharged, before verdict given and recorded, it shall be allowed in evidence that the jury were agreed.—1 *Morg. Ess.* 94. 2 *Roll.* 680. The case in *Hardres's Rep.* 118, does not apply to the present question. The case in 3 *Mod.* 141, shews that the case referred to by the elementary writers does not support the position contended for on the other side. And the case in 1 *Stra.* 162, proves that the verdict may be admitted in evidence for some purpose, to prove a trial was had between the same parties.

He distinguishes between a special verdict, and a verdict where the judgment is arrested.

*Third question,* (on the *fourth bill of exceptions.*) The moment a slave arrives in England he is as free as if he had been legally manumitted by deed. *Joice* having been in England, she was, and her issue are, free; and no contract made between Lord *Baltimore* and her master, is valid, because she did not consent. Having been once free, she and her issue always remained free, and no subsequent event could effect a change in their condition. No person is naturally a slave, and by the common law of England no person could have a property in another.—1 *Ruther.* 149, 474. There is no analogy between villenage and slavery—*Co. Litt. sect.* 185, &c. There are two kinds of villeins; *regardant* and in *gross.* Villeins regardant are annexed to the manor or land. Villeins in gross are annexed to the person of the lord, and transferable by deed from one owner to another.— 2 *Blk. Com.* 93. *Co. Litt. s.* 181. If they ranaway, or were purloined, they might be claimed and recovered by action, like beasts or other chattels. The law protected the persons of villeins against atrocious injuries of the lord; for he might not kill or *maim* his villein, though he might beat him with impunity.—2 *Blk. Com.* 94. The condition of villeins regardant meliorated by degrees, and they at last were considered as having a right to hold the land on performance of the accustomed services, and the lord could not determine their estate at his will and pleasure; and in process of time they were called tenants by copy of court roll, and their tenure itself a copyhold—2 *Blk. Com.* 95. When tenure in villenage was

May 1799.

Mahoney
vs.
Ashton.

virtually abolished by the statute of *Charles* the *II.* there was hardly a pure villein left in the nation—2 *Blk. Com.* 96. There was an attempt by law to make vagabonds slaves, but it was rejected by the nation.— 2 *Blk. Com.* 91, 92. Slavery originated with the Portuguese in 1543. The Spaniards and Dutch soon followed. In 1562 England followed before the navigation act. In 1672 the royal African company was established; and in 1689 England's first assiento-contract with Spain to supply their West Indies with negro slaves from Jamaica. A slave touching in England became free like contraband goods. They must come in the direct route from Africa to this country, or they came voluntary, and are free. In 2 *Lev.* 201, (29 *Car. II.* 1676,) it was held, that trover would lie for negroes as they were usually bought and sold among merchants as merchandize. But in 2 *Lord. Raym.* 1274, it was decided, that trover would not lie for a negro. By the common law no man can have property in another, but in special cases, as in a villein. There is no such thing as a slave by the law of England. If a man's servant is taken from him, he may maintain an action for taking him, if it is laid with *per quod servitium amisit.* The court denied the opinion in the case of *Butts and Penny,*—2 *Lev.* 201. The spirit of liberty is so deeply implanted in the English constitution, that a slave or negro, as soon as he lands in England, falls under the protection of the laws, and becomes a freeman; though the master's right to his service may continue—1 *Blk. Com.* 127. The law of England abhors and will not endure the existence of slavery within the nation—1 *Blk. Com.* 424. The relation between master and slave is not abolished or dissolved by the slave's going into England; it still subsists in some degree; the right of property is divested; trover will not lie; neither will trespass lie. 1 *Ld. Raym.* 146.—A right to the services of the slave still exists, and an action will lie for the taking a negro with a *per quod servitium amisit.* The master may maintain an action against any one who employs him after notice of the relationship subsisting between the master and him, and recover damages equivalent to the loss sustained thereby. Every right and remedy, not incompatible with the laws of England, may be exercised by the master. If a man is hired for a year or term of years, and deserts the service of his master before the expiration of the time he contracted to serve, an action will lie, and damages may be recovered. Men may be the owners, and therefore cannot be the subject of property—*Salk.* 666. As soon as a negro comes into England he becomes free—*Holt's Rep.* 495. In the great case of *Somerset,* (*Lofft's Rep.* 9,) it was finally ascertained and declared to be the law

MAY 1799.

Mahoney
vs.
Ashton.

of the land, that as soon as ever any slave set his foot upon English territory he became free.

*Ridgely,* on the same side. [See his argument in the general court, *ante.*]

*Martin,* (Attorney General,) in reply. This was an action tried in the general court, before a jury, on matter of fact, and not before the court, as was formerly the course of trying petitions for freedom. The court only decided the law arising in the case. This court can therefore take notice only of such parts of the depositions as are inserted in the bills of exceptions taken at the trial. The record transmitted contains the whole of the written testimony offered at the trial; but there was parol evidence offered, which forms no part of the record before the court. And if this court were to decide on the evidence as it appears before them, they would act upon a very inconsiderable part of what was before the jury. The question must depend on those parts of the depositions upon which the general court decided, and to which bills of exceptions were taken by the defendant in that court.

*The first question* arises upon the *first bill of exceptions,* as to the evidence of opinions as to a right, and not of facts whereon such opinions were grounded. General reputation may be given in evidence of facts in certain cases, but not the legal inference deducible from facts. A witness has no right to give an opinion to the jury of a right; he must relate facts, and the jury are to form their opinion from those facts. Whether a person exercises the right of freedom is a fact; but his right to freedom is not a fact. Persons are frequently declaring that all negroes are entitled to freedom—Forty years hence this will be reputation, and be brought forward to prove they are entitled to freedom. Our courts have determined that general reputation, that such persons are descended from white women, or that they have exercised the right of freedom, is evidence to the jury. It is giving the power to ignorant persons to judge of rights. In the case of the *Butler's,* reputation was given in evidence that they were descended from a white woman; so also in the case of the *Toogood's.* In the case of the *Queen's,* that they were descended from a native Indian of South America. In all these, and in many other similar cases, hundreds of negroes have been let loose upon community by the hearsay testimony of an obscure illiterate individual.

*Second question,* (on the *third bill of exceptions,*) whether or not a special verdict, set aside for defects, can be given

in evidence in a subsequent trial between the same parties. The same evidence, it is admitted, was in the power of the party at the last trial which he had at the time when the special verdict was found. What one jury finds is not to bind the consciences of another. Whenever a verdict is allowed to be given in evidence, the introductory evidence is not read to the jury; it is only evidence that there had been a trial between the same parties in order to introduce an account of what the witnesses swore at the trial. No case has been produced where a special verdict, upon which no judgment had been given, has been read in evidence at a subsequent trial. A verdict will not be admitted in evidence without likewise producing a copy of the judgment founded upon it; but the rule does not hold good in the case of a verdict on an issue directed out of chancery, because it is not usual to enter up judgment in such case; but the decree of the court of chancery must be produced.—*Buller's N. P.* 234. *Theory of Evid.* 21. The bare producing the *postea* is no evidence of the verdict, without shewing a copy of the final judgment; for it might have happened that the judgment was arrested, or a new trial granted.—*Esp.* 750. 1 *Stra.* 162. In *Com. Dig. tit. Evidence,* it is said, a verdict may be given in evidence, although the judgment was arrested for want of form—(Cites 2 *Roll. Ab.* 46.) But in the same book contra, (cites the case in 1 *Stra.* 162,) and also, "If a verdict be offered in evidence it ought to be proved by an exemplification of the verdict and judgment upon it." The cases in 2 *Roll. Ab.* 46, 680, do not support the position contended for by the opposite counsel. *Lofft's Gilb.* 35, when abridging from *Gilbert,* leaves out that part which says if judgment given in evidence, &c.

*Third question* (on the *fourth bill of exceptions*) is, whether or not if *Joice,* the ancestor of the petitioner, was in England, and came from thence to Maryland, she and her issue are free? If *Joice* was a slave, and was sold as such, she did not by the mere act of going to England become free and enfranchised. There the law recognizes the doctrine, that a person may have property in a negro. But supposing she was entitled to her freedom, if there was no adjudication in her favour in England, the right of her master was not divested, and upon her being brought into this country she was placed in the same situation as to her master, in which she was before she went to England. It has been said that there is no analogy between villenage and slavery. I contend that a *slave* and a *villein* mean the same thing; that villens are slaves; cites *Co. Litt.* 116. a. 117. b. 123. sect. 187. *Chamber's Dict. verbo. villein Cowel Inter. tit. Villein. Sul-*

lican's Lectures, 64, 307, 308. Dalrymple's Feuds, 28. Finche's Law. 159. Bracton, B. 1, ch. 6, 9. Fleta, p. 1, c. 1. Mirror, 109, 110, 112. Spelman on Feuds, ch. 7, p. 15. 2 Blk. Com. 93. Villeins might be recovered by action like other chattels. The conclusion is, that by the common law, men were slaves, and that slavery did and can exist in England. A negro in America is in the same state that a villein in gross was in England, subject to the will of his master, labouring under every incapacity as to the rights of property, and liable at any and every moment to be sold. It is urged against this, that his lord had no power over the life or limb of a villein—neither here has the master of a slave any such right. A villein might be confined by his lord; so can a slave be confined by his master. It has also been said, as evincing the distinction between slavery and villenage, that one villein could sue another. This is a mere difference between the legal institutions of the two countries. If a villein did sue another, whatever he recovered went to his lord; but with us the form of remedy given to the master is different; for he must sue in his own name, and not in that of his slave, who can have no rights but those of personal protection from being cruelly and wantonly maimed or murdered, a right which they derive from the mere circumstance of their being human beings, and of course, as well as ourselves, under the protection of the divine laws. Neither did, as has been contended, the statute of Charles II. relate to villeins in gross. It affected only villeins regardant. The law as to the former is still unrepealed, although there are now in England no objects for it to operate upon. A negro is not within the contemplation of the laws of England. Magna Charta was a compact with the freeman, and extends not to villeins, ch. 4. vide also Barrington on statutes, 8. Much has been said about the rights of villeins in England; the history of their jurisprudence by no means shews that they were regarded in a favourable light, but indeed in quite a contrary one. The laws about villeins were most severe. and highly penal, as for instance the statute 25 Edw. III. ch. 18. By another statute, if they departed from the service of their master, and went into another county, they might be reclaimed and punished with burning in the forehead. It is true a villein might have a writ of habeas corpus if unjustly or without cause detained in prison; but disobedience to his lord, or refusing to obey his lawful commands, were adjudged sufficient causes. 33 Edw. III.— "Villein detained in confinement for refusing to drive his lord's cattle, and remanded on habeas corpus." Even the celebrated petition of right, (3 Car. I. ch. 1,)

in 1628, speaks only of freemen. In the *5th. clause,* after reciting in the previous ones the privileges of the freemen, the grievance complained of is, that the king's subjects had been detained and imprisoned without cause shewn; and when for their deliverance they were brought before justice by writs of *habeas corpus,* no cause was certified by their keepers, "but that they were detained by the king's special command, signified by the lords of the privy council." And in *clause* 10, the request of the parliament is, "that *no freeman* in any such manner as is before mentioned, be imprisoned or detained"—5 *Hume's Hist. Eng. ch.* 51. Note [B. B.] In the *habeas corpus* act, *(*31 *Car. II. ch.* 2, *s.* 12,*)* there is a provision to prevent imprisonment beyond seas; but this act is confined to *the subjects* of Great Britain—Villenage was at that time literally worn out; hence is the reason why the term *freemen* is not used. I contend that this act never was intended to be applied to negroes, of whom there were none at that time *subjects* of the realm. The history of the slave trade has been adverted to—no person can properly advocate slavery, but the emancipation of slaves at this time would be productive of incalculable evils. I am not an advocate for slavery; neither has the morality or immorality of the practice any thing to do with this case. The only question before the court is this, *what is the law upon the subject?* To determine this question it may not be improper to advert to the history of the slave trade, and view its rise and progress. The discovery of America first gave rise to it; and we find the Portuguese were the first who engaged in it in the year 1443. The Dutch soon followed their example. The English did not engage in this trade until 1562, and slaves were first brought into Virginia in 1620, long after the patent of Queen *Elizabeth* to an African company, in the year 1585. It may here be remarked, that the trade to Africa was carried on under *the sanction of the British government;* and this will rebut the arguments which have been so much pressed as to the abhorrence of the laws of that nation to slavery. In 1592 another patent was granted, under which this trade to the coast of Africa was prosecuted until 1618, when a new charter was granted by *James I.* In 1631 *Charles I.* granted another charter; and in 1651 the Rump Parliament granted a similar one. These, or at least some of them, were after 1620, when slaves were first brought into Virginia.

After the restoration, we find that *Charles II.* in 1662, incorporated his own brother, the Duke of *York,* and many others, into a company, which contracted to supply the plantations, as we were then called, with slaves. About this time a war broke out between England and

Holland, and this charter either expired or was revoked. But again in 1672 the Royal African Company was incorporated, and the sum of 111,000*l.* sterling was subscribed as a capital. It is in vain that we recur to these acts of the government itself for evidence of its abhorrence of the slave trade; they prove quite the contrary of the doctrine advanced by the counsel on the other side. This last company supplied the American plantations with slaves, and also the Spaniards, as we find in the reign of *William & Mary;* in 1688 they entered into a contract with Spain for supplying their West-Indian possessions with slaves. Until 1698 the slave trade was carried on under the auspices of the English government, and was a monopoly until that time, when a law was passed (9 and 10 *W. III. ch.* 26,) granting liberty to all the king's subjects to trade on paying 10 per cent. to support and repair the forts and castles on the African coast. In 1709, 1711, and 1712, the parliament declared that this trade should be open to all the subjects of the realm. In the treaty of Utrecht in 1713, there is an express stipulation, that 4800 slaves should be annually supplied to the Spaniards. In 1726, (13 *Geo. I. ch.* 8,) the trade to Madagascar was opened to the South Sea Company, with the consent of the East India Company; their ships were not prohibited by this act from coming to Great Britain with slaves, though the act rendered it unnecessary that they should touch there. This trade in the year 1748, was found to be an extremely beneficial one, and in that year the Royal African Company relinquished their charter. The trade to the coast of Africa was afterwards, in 1750, opened to all the subjects of the realm, by the act of 23 *Geo. II ch.* 31; and two years after this act, the Royal African Company were divested of all their forts, castles, &c. by the statute of 25 *Geo. II. ch.* 60, and compensation was made to them for any loss which they sustained. In estimating this loss, all the negroes which belonged to the company were considered in the same light in which their other property was viewed, and therefore as transferable from one person to another. In 1765 the parliament passed another statute, (5 *Geo. III.*) vesting in the crown the property in all the forts, castles, &c. upon the coast of Africa, and repealing all the former statutes upon that subject; yet by this law the slave trade was still left open and free to all the subjects of Great Britain, who might choose to engage in it. Again in 1766 another statute, (5 *Geo. III. ch.* 49. *s.* 5, 12,) passed, laying duties on the exportation and importation of slaves from and into the British West India Islands, and the American Plantations. Thus we find, that this

trade has not only been sanctioned, but encouraged by the parliament of Great Britain, from the year 1585 down to the present time. By the statute *5 George II. ch. 7. s.* 4, negroes are made liable for the payment of debts. They are viewed in the same light as other property liable to execution, and always to be valued and considered as assets in the hands of an executor or administrator. Before the year 1663 we had negro slaves in this country. This is evident from the act of assembly of that year, *ch.* 30, speaking of negroes and other slaves, *already* imported, &c. and these negroes, being slaves, were deemed as property, and transferable from one owner to another. This right to them too, is not considered by the law as depending on contract or consent, more than the right which any man has to his horse, or to any other description of property which he may possess. Slavery originated *ex jure gentium* by reason of captivity.—*Hob.* 99. That it has existed almost universally, and in all ages, I refer to the Mosaic law. In adverting to the decisions in Great Britain upon the subject of slavery, or the holding of negroes as property, the first case I will notice is that of *Butts vs Penny,* (2 *Lev.* 201, *S. C.* 3 *Keb.* 785.)—Here the court decided, that trover will lie for negroes. This decision was in 29 *Car. II.* in B. R. (1677,) and upon the ground that they were bought and sold as merchandise. In 3 *Lev.* 336, *Chambers vs. Warkhouse,* in C. B. 4 *W. & M.* (1702,) this decision is recognized. The court did not distinguish, and could not, between negroes and other goods or chattels. The special verdict found that they were bought and sold as merchandise. In *Barrington on Statutes,* 240, (*notes*) in his observations on the Statute of 1 *Rich. II.* (1377,) says, "it is laid down that trover will lie for a negro in 2 *Lev.* 201, and it seems to be agreed by two cases in *Salkeld's Rep.* 666, that some kind of action will lie for a negro, though not an action of *trover.* I cannot say indeed that these cases are well reported. The term *slave* is certainly not unknown to our law, as by 1 *Edw. VI. ch.* 3, a vagabond and idle servant is to become *a slave* to his master, and the expression is frequently repeated in that statute." In the case cited in 1 *Ld. Raym.* 147, (*Gelly vs. Cleve,*) we must suppose there was a special verdict finding the negro boy an African and a heathen. This decision was in 1693, (5 *W. & M.*) In 1749, Lord *Hardwicke,* sitting as chancellor, recognizes the doctrine that trover would lie for a negro slave. And we find that it was the opinion of Sir *Philip Yorke,* and lord chief justice *Talbot,* in 1729, that if a negro did go over from any of the plantations, he was not emancipated thereby, *Lofft,* 19. The case in *Carthew,* 396, *Chamberlain vs. Harvey,*

MAY 1799.

Mahoney
vs.
Ashton.

(1695,) is cited to prove that trespass will not lie. This case is reported in 5 *Mod.* 182, and the special verdict set forth, wherein it is declared, that by a law of Barbadoes, negroes should be considered as real estate, and descendible as such, after purchased by the planters. Upon this special verdict it was correctly determined, that trespass would not lie for taking real property. This case does not support the principle of a negro slave becoming free on landing in England. This special verdict was taken for the purpose of making the decision according to the *lex loci.* In 15 *Viner, tit. Negro,* 549, S. C. Held, that trespass did not lie for a negro, because not a chattel. 1 *Ld. Raym.* 146, S. C. held that trespass did not lie for taking a negro slave in England, unless with a *per quod servitium amisit*; and the same reason is given. What is stated to have been said by Lord *Holt* was extra judicial—a mere dictum of his own, and is no authority; for it is laid down that an extra judicial opinion is not to be taken as authority; that an opinion not necessary to be given in deciding a cause is a mere dictum, and is not obligatory—*Vaugh.* 382. The case of *Smith vs. Brown* in 2 *Salk.* 666, S. C. *Holt's Rep.* 495, is also relied on by the opposite counsel. This was the mere dictum of Lord *Holt* in 1704, and as before shewn, is not entitled to the weight of authority more than as the opinion of a single judge; and we see that afterwards, in 1749, it is expressly contrary to the opinions of Sir *Philip Yorke,* Lord Ch. J. *Talbot,* and Lord Chancellor *Hardwicke.* But the decision, to call it one, does not contradict former ones. It is not stated in the case that the negro was *sold as merchandise.* The declaration states no right on common law principles, and the laws of a foreign country could not be noticed unless set forth. According to common law principles, an action could not be brought for a *man;* and therefore *indebitatus assumpsit* would not lie for the price of one; yet it is undeniably a principle of that law, that "all rights acquired shall be supported." And if the declaration had stated the law of Virginia, the action would have been sustained. Upon examination, the case of *Smith vs. Gould,* in 2 *Salk.* 666, 667, also relied upon, does not sustain the principle now contended for. This case is most accurately reported in 2 *Ld. Raym.* 1274. The judgment was by default, and there was no verdict as is stated in *Salkeld.* Nothing was stated in the declaration but that the man was a negro; whereas it ought to have appeared that negroes were bought and sold as merchandise by the usage of merchants, and according to the laws of the plantations. The case went off upon the same ground as that of *Smith*

*es. Brown,* for defect in the declaration in not setting forth how the right to the negro was acquired, thus to avoid the operation of the maxim of the common law that an action will not lie for a man. That trover will lie for a negro slave will be seen in 1 *Freeman,* 452, and 1 *Vernon,* 450, where *Kelyne, Vaughan,* and Ch. J. *North,* all recognize the principle of trover lying for a negro slave. The law of nature is the law of God, impressed on the heart of man; and Lord *Holt,* in the case of *Smith vs. Brown,* admits that a certain sale of a negro would have been a good consideration; if so, then it is not against the law of nature and of God. Every case which has been cited maintains the position, that the master has an interest in the negro, and is entitled to his services; that property once acquired cannot be divested unless by the misconduct of the owner; and that he has a right to the perpetual service of his negro.—1 *Blk. Com.* 127, 424, 2 *Blk. Com.* 402. This is all that we insist upon in the present case. But it is said, (1 *Blk. Com.* 424,) "the law will protect a slave in his person and *his property*; yet with regard to any right which the master may have lawfully acquired to the perpetual service of the slave, this will remain exactly in the same state as before." This is absurd. How can a slave acquire and hold property? How can the law protect what was not to be protected? By *Magna Charta, ch.* 30, all merchants are allowed free ingress and egress, and their property is guaranteed to them, whilst they remain in the realm. "And thus the protection of foreign merchants, (says *Montesquieu*) is an article of their national liberty." The same principle is recognized by 14 *Edw. III.* In 1381, (5 *Rich. II. ch.* 2,) all merchants and strangers were permitted to come to England to merchandise, and their goods and chattels are protected. This is the undisputed rule or principle of law in Great-Britain now, and ever has been since *Magna Charta.*—1 *Blk. Com.* 135. Negroes, we contend, are property, and merchandise, and are sold as such. By the statute 5 *George II. ch.* 7, they are considered as property, and made answerable for British debts. Goods under an act of parliament are permitted to be exchanged in Africa for slaves; the transfer there to the buyer is complete, and he acquires his slaves as merchandise; and as such, under every principle of law, justice and common honesty, his property thus obtained, is and ought to be protected.

A case has been put of the wreck of a ship on the coast of England, and another of slaves escaping and getting to England. In either case, as the property vested in the owner under the sanction of acts of parliament, it would be protected as much as any other species of goods or

MAY 1799.

Mahoney
vs.
Ashton.

chattels, or any other kind of merchandise whatever. In *Somerset's* case, *(Lofft's Reports,* 9,) it is very evident that Lord *Mansfield* waivered much and was very undecided in his opinion.   He observes, " much consideration is necessary; the court must consider the great detriment to proprietors.   The statutes of the realm have interfered for the maintenance of the trade in slaves, and the transferring of slavery.",   " A right of compulsion there must be, or the master must be under the ridiculous necessity of staying here to have their service, or must be quite deprived of those slaves he has been obliged to bring over."   In giving his opinion, *(page* 17,) his Lordship said, that he advised an accommodation; and he still shewed great hesitation and indecision.   This case therefore should not be suffered to shake the principles recognized in other decisions, and fairly deduced from acts of parliament, and maxims of law coeval with the existence of the common law.   The case of *Somerset* was decided upon the return of a writ of *habeas corpus.*   Suppose a soldier were to desert, and he was seized without application to the government, he would on a *habeas corpus* be released.   We admit that the decision of Lord *Mansfield* divested the master's right; yet we contend that the moment the master and slave left England, the master's right revived.   Suppose a man has a right to kill his child in China; if he goes to England he cannot exercise the right there; but if he returns to China, the right revives to him.   To prove that slavery may cease for a time and again be revived, cited *Sullivan's Lectures,* 317.   If a villein becomes a monk, he is free; if he is deprived of his order and turned out of the convent, the master's right returns—*Ib.* 318.   So if a niece marries a freeman, she thereby becomes free; if her husband dies, or she is divorced, her master's right to her service revives—*Ib.* 318.   If a villein gets into the demesnes of the king, the master loses his right, but when he is caught out of the demesne, he is again in the power of his master—*Ib.* 319.   So here, when the master of *Joice* returned with her to Maryland, or got her out of England, the right he had as master could be exercised, and she became his slave.   The laws of England will not take notice of our municipal laws; shall we then enforce those of England?   Suppose there is a law in England preventing wheat being imported into that country from America, and an American carries wheat there, and lands it; by the law of England it is liable to forfeiture—But suppose he gets it on board of his vessel again, and carries it to France, has he not a right to his wheat?   The court here are called upon to enforce British municipal regulations, and to disregard our own.   The common law, at the time

*Joice* was in England, was that trover would lie for a negro slave; and the case of *Somerset* was afterwards, and therefore is not applicable. Lord *Mansfield* may be charged with bending to the policy of the times—*Wilks* and *Liberty*; of which the young heated brain of *Hargraves*, who argued the case, was full; and Lord *Holt*, when he made the dictum spoken of, had a revolutionary ebullition of liberty in his brain. If subsequent decisions were to have a retrospect operation, it would create great uncertainty in property. And as to the impropriety of changing the law, and making different decisions, cites 1 *P. Wms.* 399, 452. It is better to stick to the known general rule; for it is dangerous to alter old established forms.—*Ca. Temp. Tal.* 26, 27, 195. The British air is supposed to electrify the flesh—putting a foot on the island, the nature is instantly changed, and if a slave before, becomes thereby free. Suppose *Joice* was born before she was in England, or the African vessel in which she was, had stranded on the British coast, or she had run away; would all or any of these circumstances entitle the issue to freedom, being afterwards brought here and in the possession of their master claiming their services? Certainly not, we think. The acts of assembly of Maryland of 1663 and 1715, speak generally, that all negroes, and *other slaves,* imported into the province, without any restriction as to the place whence they are brought, and their issue, should be slaves for life. There was no emigration of free negroes from Africa at that time. Under those acts negroes might be imported from Great-Britain as slaves. Before the year 1663 there was the same commercial intercourse with respect to negroes as there was with respect to merchandise; and being a mere article of commerce, slaves could be smuggled and held in the same manner as any other goods or merchandise could be. The penal laws of one country cannot be enforced in another. Suppose a negro is stolen or kidnapped and brought to this country, could he not be sold and held as a slave? The act of assembly of Virginia, passed in 1753, *ch.* 2, was not binding in Great-Britain; that act was made to prevent the slave from claiming his freedom in case of his return to Virginia. Lord *Baltimore* in *loco* of the seller of *Joice,* and he would have the same right as if she had been brought to this country by her first master. Her children born in England, if any, would be slaves. Property cannot be changed without there has been an adjudication, and the *lex loci* of one government cannot be enforced in another, without there has been an adjudication in the courts of that government. In this case there has been no adjudication produced, whereby *Joice* was declared in England to be free

MAY 1799.

Mahoney
vs.
Ashton.

by any of the courts of that country. Shall the *lex loci* of another government be enforced in preference to our own? If a person carries his slave from this state to Pennsylvania, and remains there more than six months, and returns with his slave, the slave, it has been decided, shall not be free unless the courts of Pennsylvania set him free; although by the laws of that state such a residence entitles the slave to his freedom.

*Fourth question,* (on the *fifth bill of exceptions.*) By the act of 1663, *ch.* 30, all negroes, and other slaves, then imported, or which thereafter should be imported into Maryland, and their issue, are declared to be slaves *durante vita.* If *Joice* was here when this law was made, or if she was brought here since, she was a slave under this law, and her issue are now so.

It has been shewn, 1st. That evidence of a right was admitted improperly by the general court as evidence of a fact.

2d. That a special verdict has been admitted in evidence, when no judgment had been entered on it, and therefore not legal.

3d. That *Joice,* the ancestor of the petitioner, was not free by going to England; and if she was free there, when she left England she became a slave again.

4th. That the decision of the general court, as stated in the *fifth bill of exceptions,* is upon too broad a basis; for under the act of 1663 *Joice* and her issue were slaves.

THE COURT OF APPEALS, [*Rumsey,* Ch. J. *Mackall, Jones, Potts* and *Dennis,* J.] gave the following opinion, viz. "The court disagree with the general court in their opinion in the *third bill of exceptions.* The court are of opinion, that the general court ought not to have permitted the *special verdict,* found on the first trial, which was set aside, (because a fact was not sufficiently found,) to be read in evidence on the second trial. They consider it a good rule, that on a second trial, no advantage or use shall be made by either of the parties of the first finding, or of the opinion of the court in setting aside that verdict, but that such second trial shall, as far as possible, be conducted as if no prior trial had taken place. The record before the court proves the propriety of the rule. On the first trial an objection was made by the defendant below to a deposition offered by the plaintiff, the general court overruled the objection, the deposition was read, and the defendant's counsel then took an exception to their opinion. By granting a new trial, and admitting the verdict in evidence, the defendant there is deprived of the benefit of his exception, and he is liable to be affected by the verdict that may possibly in some measure have been influenced by the evidence excepted to.

As to the *fourth bill of exceptions*, the court are of opinion that the general court were right in their direction to the jury.    It is merely stated that *Ann Joice* was in England, and came from thence, without shewing her condition previous to the period alluded to, whereby it doth not appear that she was ever held or claimed as a slave at any time, and it might be that she was a white woman, or native of England; presumption, when admitted, being in favour of freedom.    In deciding this exception, the court do not think themselves at liberty to travel out of the exception, or notice any fact not therein stated.

Upon the *fifth bill of exceptions* this court disagree with the general court.    It is in that exception stated "that *Ann Joice*, a negro woman, was carried with her owner, Lord *Baltimore*, claiming her as a slave, from the Island of Barbadoes to England, and afterwards brought into this country by him, claiming her as a slave, between the years 1678 and 1681; and that she, during her life, was held and treated as a slave, and that her issue have been held as slaves ever since." It is not stated that her case was ever before a British or any other tribunal, or had received a judicial decision.

Great industry hath been used, and great ability displayed by the counsel, in the argument of this cause.    The decision, involving on the one hand the question of freedom or slavery to the plaintiff below, and on the other great pecuniary interests to persons claiming negroes under similar circumstances, demanded it.

The court have felt the importance of the subject, and given it their most serious consideration.    If this case was before a British court, it would seem, that the question should be decided according to the British law, as it stood between the years 1678 and 1681, and not by the law as it may have been modified or altered subsequent to that period.    No adjudged case in the British books hath been cited, nor have the court been able to find one coming up to the case in the exception.    Opposing cases as well as opinions of particular judges and law writers, have been cited as applicable to the case.    About the period of *Ann Joice's* being in England, a diversity of opinions prevailed on that subject.    At one period it was held by a judge, that a slave, by being brought to England thereby became free.    Sometimes it hath been held that trover would lie, at other times that it would not; that the sale of a negro was a sufficient consideration to support assumpsit to pay the price; that a master, deprived of his slave, might support an action *per quod servitium amisit*.    By British charters, and British acts of parliament, the slave trade hath been authorised and

MAY 1799.

Mahoney
vs.
Ashton.

encouraged, and slaves have been considered there as merchandise, as chattels, as property, and have, by a British statute operating in this state, been subjected to be sold and disposed of as other property for the payment of debts. Lord Chief Justice *Talbot,* and Sir *Philip Yorke,* in 1729, expressly declare, that a slave coming from the West-Indies, with or without his master, to Great-Britain or Ireland, doth not become free, and that his master's property or right in him is not thereby determined or varied, &c. And that his master may legally compel him to return. This opinion is recognized by *Hardwicke,* acting as chancellor, in 1749, and that trover would lie for a negro. Judge *Blackstone* in his Commentaries, in 1765, *(11 edition, vol. 1, page 127,)* says, that a slave or negro the moment he lands in England falls under the protection of the laws, and so far becomes a freeman; though the master's right to his service may probably still continue. And in *page* 424, repeats the same, and adds, that the law will protect him in the enjoyment of his person and property; but yet with regard to any right which the master may have lawfully acquired to the perpetual service of John or Thomas, this will remain exactly in the same state as before; for this is no more than the same subjection for life, which every apprentice submits to for the space of seven years or more, &c.

In the British books slaves are sometimes called slaves or servants; and it is said by Lord *Mansfield* in *Somerset's* case, that there may be a villein in gross by confession. In the case of *Somerset* in 1772, Lord *Mansfield* mentioned the opinions of Sir *Philip Yorke,* and Lord Chief Justice *Talbot,* in 1729, and recognized by Lord *Hardwicke* in 1749, and calls them two of the greatest men of their own or any times, and says he pays all due attention to their opinions. Lord *Mansfield* puts several questions as to the law with respect to their settlements, their wages, actions for any slight coercion by their masters. In *Somerset's* case the court declined deciding the question, whether by being carried to England he thereby became free; but say, that they would judge upon the return of the *habeas corpus,* and according to their own laws, which did not admit of so high an act of dominion as in that case had been exercised by the master over his slave, and therefore that *Somerset* must be discharged. Lord *Mansfield,* in *Somerset's* case, says, that the state of slavery is so odious that nothing can be suffered to support it but positive law.

In this collision of individual opinions, and opposing decisions, in the British books, this court will not say what would have been the decision of a British tribunal

on the question stated in the exception; and acting as a court of an independent country, unfettered by any political stipulations on subjects of this nature, and bound to decide according to the laws of this state, they do not consider themselves at liberty to adopt an opinion that might possibly prevail in a foreign tribunal.

By a positive law of this state in 1715, then the province of Maryland, the relation of master and slave is recognized as then existing, and all negro and other slaves, then imported, or thereafter to be imported into this province, and all children then born, or thereafter to be born, of such negroes or slaves, are declared to be slaves during their natural lives.

This case, being brought before the court by original proceeding, we are of opinion that it must be governed by the law of this state; and that in this case, however the laws of Great Britain in such instances operating upon such persons there, might interpose so as to prevent the exercise of certain acts by the master, not permitted, as in the case of *Somerset;* yet upon the bringing *Ann Joice* into this state, then the Province of Maryland, the relation of master and slave continued in its extent as authorised by the laws of this state; and therefore that the judgment of the general court must be reversed. As to the other *bill of exceptions,* (the first) this court concur with the general court.

The *second bill of exceptions* not being before the court, no opinion was given thereon.

JUDGMENT REVERSED, and *procedendo* awarded.